[Cite as *State v. Genao*, 2026-Ohio-3020.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 115679 |
| v. | : | |
| MIKI GENAO, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 6, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-682387-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Omar Siddiq, Assistant Prosecuting Attorney, *for appellee.*

Berkman, Gordon, Murray & DeVan and William C. Livingston, *for appellant.*

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant Miki Genao ("Genao") appeals his convictions for gross sexual imposition, domestic violence, and pandering sexually oriented matter involving a minor. For the reasons that follow, we affirm the convictions.

## I. Factual and Procedural History

{¶ 2} A grand jury convened in August 2023 and returned an indictment against Genao for the following crimes: two counts of rape in violation of R.C. 2907.02(A)(2), felonies of the first degree (Counts 1 and 2); gross sexual imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree (Count 3); domestic violence in violation of R.C. 2919.25(A), a felony of the fourth degree, with a furthermore clause that Genao had pleaded guilty or been convicted of attempted assault of a family or household member (Count 4); and pandering sexually oriented matter involving a minor in violation of R.C. 2907.322(A)(3), a felony of the second degree (Count 5). Counts 1 through 4 alleged that the victim was Genao's daughter (the "minor child") who was 16 years old at the time of the alleged crimes. Count 5 addressed a video discovered on Genao's phone pursuant to search warrant depicting minors engaged in sexual activity, masturbation, and bestiality.

{¶ 3} The case commenced with two separate trials, with Counts 1 through 4 tried to a jury and Count 5 tried to the bench.

### A. The Jury Trial on Counts 1-4

{¶ 4} Prior to trial both parties filed motions in limine. The State filed a motion to exclude evidence of internet searches that the minor child conducted before and after the incident. One of the searches sought information regarding a rape of a young girl the minor child had heard about, while the others involved the risks of getting pregnant, and how long DNA remains present after sex. The trial

court ruled that it would allow the defense to question the minor child on some of the searches during cross-examination.

{¶ 5} Genao filed three motions in limine to exclude (1) all evidence of the search of Genao's phone from the jury trial; (2) prior alleged incidents of sexual assault; and (3) testimony or evidence of past violence or physical abuse involving the minor child and Genao. With respect to the first motion, the trial court granted the motion to exclude testimony regarding the video found on Genao's phone. However, the trial court allowed testimony regarding a phone call that the minor child claimed Genao and his girlfriend had on the day of the incident. The trial court held its decision in abeyance on Genao's second motion, concerning the admissibility of prior sexual assaults pending additional review of the relevant case law. With respect to the third motion, contemplating prior acts of violence, the trial court found it would be reasonable to question the minor child regarding Genao's use of a belt given the minor child's allegation that Genao used the belt to coerce her into sexual activity.

{¶ 6} The trial court later revisited the defense's motion to exclude prior sexual assaults and denied the motion in part. The trial court allowed the State to introduce testimony from the minor child regarding specific acts within a set time frame to establish a pattern of grooming.

{¶ 7} The State called the minor child as its first witness. The minor child testified that she was 17 years old at the time of trial. She had spent most of her life living with her mother in the Dominican Republic, but had stayed with Genao for a

brief period when she was 10 years old, returned to the Dominican Republic, then moved back to the U.S. when she was 12. On the date of the incident, Genao and the minor child lived in a ground-floor apartment in Westlake.

{¶ 8} The minor child testified that she sneaked her boyfriend into her room around midnight on the day of the incident. Genao usually went to work between 6:30 and 7:00 in the morning. The minor child heard Genao leave for work and thought she had the apartment to herself. However, Genao came home for lunch unexpectedly, entered the minor child's room, and found the minor child and her boyfriend engaged in oral sex. Genao yelled at them, told her boyfriend to leave and smacked him on the head.

{¶ 9} The minor child testified that Genao then called her mother via "FaceTime" and showed her that the minor child was wearing a shirt without pants. Afterward, he began to "beat" her. The minor child stated that Genao punched her and pushed her to the ground. She hit the back of her head on a raised step in her closet as a result. He then proceeded to choke her with both hands and step on her chest and stomach. The minor child relayed that the "beating" lasted "about" five to ten minutes. As it was happening, the minor child recalled that Genao called her a "slut," "whore," and similar slurs in Spanish.

{¶ 10} Thereafter, Genao spoke to her and repeatedly questioned whether she was a virgin. He threatened to take her to the hospital to have them check her virginity. After driving her to the hospital and repeatedly questioning her virginity

in the parking lot, Genao drove away and took the minor child back to his job where he worked as a mechanic.

{¶ 11} When they returned home later that evening, Genao told the minor child to pack her belongings because he was sending her back to the Dominican Republic. After the minor child began packing, Genao called her into his bedroom and began lecturing her. According to the minor child, Genao stated he was disappointed in her and had wasted his time bringing her to the United States. He also told her he had "nothing to lose."

{¶ 12} Next, the minor child relayed that Genao began touching her "private area" over her clothes while she begged him to stop. The minor child explained that "private area" meant her vagina. The minor child testified that Genao kept saying that she was "not his daughter anymore" and that she was "just like any woman in the street." He told her that "he didn't care," and repeated that he had "lost everything, so he didn't have anything else to lose." The minor child reminded Genao that she was his daughter, "still his blood and still his child."

{¶ 13} In the midst of this sexual encounter, Genao received a call from his girlfriend to come pick her up from work. After he left, the minor child went into her room and cried. She did not have access to her phone or car keys because they were locked in her car. Genao returned sometime later and then told the minor child to come into his bedroom. At that time, she noticed a bottle of alcohol and that Genao had been drinking. He again started telling her that he was disappointed in her and "embarrassed to call [her] his daughter," reiterating that "he didn't have

anything else to lose anymore." The minor child responded by trying to comfort Genao because his reaction was out of the ordinary and it made her feel "bad" about the situation.

{¶ 14} The minor child testified that Genao then told her that since she was not his daughter anymore, "he didn't have a problem doing what he was about to do." Thinking he would begin to touch her again, the minor child tried to make an excuse to leave the room. The minor child testified that Genao refused to let her leave the room, closed the door, and Genao told her to sit on the bed. The minor child continued to plead with him, reminding him that she was his daughter. Genao kept repeating that he did not care anymore. He asked the minor child to touch his penis through his clothes. She did not comply and continued to reason with him. Genao continued to reiterate that he "didn't care about anything anymore." The minor child testified that he grabbed his belt so she would not leave. She went on to testify that she was afraid of the belt because Genao had previously hit her with the belt. The minor child testified that she sustained bruises from the incident that lasted for almost a month.

{¶ 15} The minor child testified that Genao then proceeded to sexually assault her, performing oral sex on her, penetrating her with his penis for about one minute, and ejaculating inside her vagina and onto the carpet. Afterward, he instructed the minor child to put her clothes on and to sleep in his bed. When he left to use the bathroom, the minor child grabbed the car keys and ran.

**{¶ 16}** The minor child exited the apartment and encountered a couple sitting in a car in the parking lot and knocked on the window. The woman called 9-1-1 for her. The minor child was later transported to the hospital where evidence was collected for a sexual assault kit.

**{¶ 17}** The minor child then offered testimony about internet searches the State found on her phone. She explained that she would look up any questions she had on her phone because she was unable to talk to her mother or anyone else. After the incident, she researched "how long does sperm DNA stay in the body" and "how long rape kits usually take." She was afraid she would have to live with what happened for the rest of her life and become pregnant by her father. She also wanted to know how long it would take to analyze the rape kit.

**{¶ 18}** Finally, the minor child testified regarding two additional incidents. One occurred in 2022. She related that she and Genao were drinking "moonshine" at his job. When they returned to her aunt's home, where they were staying at the time, her aunt saw "how she was" and gave the minor child a cold shower. Afterward, she and Genao went to the basement, and her aunt went upstairs. When they were alone, the minor child testified that Genao told her he could get in trouble for what he was about to do and touched her vagina over her clothes. The minor child called for her aunt, Genao stopped touching her and the minor child fell asleep. In a separate incident in 2023, the minor child testified that one day while at Genao's job, she and Genao decided to race. The minor child told him that she would get all

the candy she wanted and $50, if she won. Genao replied that if he won, he would get to see her vagina and her wearing a thong that he saw in her bedroom.

{¶ 19} On cross-examination, the minor child acknowledged that she let her boyfriend into her bedroom through the window and it was not the first time she had removed the screen to sneak someone into her room. The defense questioned the minor child about differences in her testimony in court and statements she made at various stages of the investigation. This included differences in how she described the physical and sexual assaults, whether she was clothed or unclothed when Genao touched her vagina, her demeanor when she was interviewed, and a photograph she took of herself while in the hospital.

{¶ 20} The defense also questioned the minor child about a text exchange between her and her boyfriend, in which she asked him to mention to the police that Genao slapped her while he was there. The minor child confirmed that she did not testify about the slap. Further, the defense played a recording of a conversation between the minor child and a third party, in which the minor child can be heard saying, "Do you want to fuck?" The conversation was a mixture of English and Spanish. When the defense showed the minor child a translation of the conversation, the minor child testified that it was inaccurate. The minor child testified on redirect examination that the statement was in response to Genao's repeated questions about her losing her virginity and simultaneously calling her slurs.

{¶ 21} Westlake Police Detective Charles Kalo ("Det. Kalo") was assigned the case. He testified that during the investigation they found fresh dried blood on the minor child's bedding in different places and dried blood splatter on the wall next to the minor child's bed. Additionally, Det. Kalo directed officers to examine the carpet in Genao's room based on the minor child's description of what occurred. An ultraviolet light detected some phosphorescent material. He then requested that officers collect that section of carpet to submit to the lab with a request that they test it. Officers recovered two bottles of liquor, one next to Genao's bed and another in the trash can near the kitchen. The bottle in the trash matched the minor child's description of it. Det. Kalo also collected two cell phones, one of which received a call around 9:50 p.m., from Genao's girlfriend on the night of the incident, which aligned with the minor child's recitation of what occurred. In addition, he collected the minor child's cell phone.

{¶ 22} Nina Lavigna ("Lavigna") testified that she and a coworker were parked in an apartment parking lot when a young girl ran towards them, made eye contact with Lavigna, and started knocking, "pretty frantically," on the car's window. Lavigna later identified a picture taken at the scene that depicted the minor child sitting on the curb. Lavigna described the minor child as "very disheveled." The minor child asked to get in the car and told Lavigna that her father had raped her. Lavigna asked if she could call 9-1-1 for her instead. Lavigna called 9-1-1 and the State played the recording for the jury. After the police informed her that they were on their way, Lavigna got out of the car. Once she was closer, she could tell that the

minor child was young, and only wearing shorts, a loose-fitting top, and no shoes. She described the minor child as being "very upset and shaken." The minor child kept looking around and over her shoulder. Lavigna tried to calm her down and comfort her. She also offered the minor child her sweatshirt. As she continued to sit with her, Lavigna noticed that the minor child had stopped looking around and was staring "blankly" and "dissociatively into the ground."

{¶ 23} Westlake Police Officer Anne Smith ("Officer Smith") was one of the first officers at the scene. When she arrived, she noticed the minor child sitting on the ground, barefoot, crying, and wearing pajamas. Officer Smith testified that she talked to the minor child while they waited for an ambulance to arrive. Officer Smith had to calm the minor child down since the minor child was upset and would begin hyperventilating. The minor child would regain her composure and then become upset again.

{¶ 24} On cross-examination, Officer Smith testified that she did not see blood or swelling on the minor child's face. She did, however, feel a knot on the back of the minor child's head but could not see it because of the minor child's hair. Officer Smith also testified that the minor child mentioned that Genao put his knee in her back when she got to the hospital but did not mention that Genao choked her using both hands, or stepped on her chest and stomach. Officer Smith noted that she was aware of two incidents of sexual assault, one before Genao went to get his girlfriend and one after. Furthermore, she testified they found blood on the wall and on the bed sheets in the minor child's bedroom.

{¶ 25} Westlake Police Sergeant Stephen Barnie ("Sergeant Barnie") testified that there was evidence of recent vacuuming in Genao's apartment when he arrived. He also observed that Genao appeared impaired since he had red, glassy eyes and was "kind of" unsteady on his feet. Sergeant Barnie also found it difficult to understand and follow what Genao was talking about when he responded to direct questions. Sergeant Barnie further testified that Genao admitted drinking two beers.

{¶ 26} On cross-examination, Sergeant Barnie acknowledged that he did not mention recent vacuuming in his report because he did not think it was relevant at the time. Sergeant Barnie identified a picture of Genao's hands that showed a healing cut on one finger, multiple black fingernails consistent with an injury, and dirt and grime under the nails. Additionally, Sergeant Barnie acknowledged that the police report did not mention Genao's red eyes or Sergeant Barnie's difficulty in understanding Genao.

{¶ 27} DNA Analyst Brittney Svoboda ("Analyst Svoboda") analyzed the contents of the sexual assault kit collected from the minor child at the hospital by Sexual Assault Nurse Examiner Megan Verel ("SANE Verel"). Analyst Svoboda then compared the DNA samples with those collected from the minor child and Genao. SANE Verel collected samples from the minor child's vagina, mouth, mons pubis/labia majora, bilateral inner thighs, left and right hip, and bilateral neck. Presumptive tests indicated the presence of seminal material in the vaginal swab and mons pubis/labia majora areas; however, the result could not be confirmed on

further testing. Analyst Svoboda found that the sample collected from the mons pubis/labia majora contained DNA that matched Genao. Analyst Svoboda testified that the match was "565 million times more probable than coincidental match to an unrelated African American person, 1.298 million times more probable than a coincidental match to an unrelated Caucasian person, and 325 million times more probable than coincidental match to an unrelated Hispanic person." Genao's DNA was not found in the internal vaginal swab.

{¶ 28} Analyst Svoboda noted that her department supervisor made the decision not to test a carpet sample taken from Genao's apartment because "the seminal material from the suspect being on his own carpet is not as probative as his DNA being on the victim's vaginal area."

{¶ 29} On cross-examination, Analyst Svoboda acknowledged that she did not know the source of the DNA found on the minor child's mons pubis/labia majora. She further acknowledged that she determined that the DNA did not come from semen but did not test the sample further to determine where it did come from. Analyst Svoboda hypothesized that it could be saliva, skin cells, or sweat.

{¶ 30} Cuyahoga County Department of Children and Family Services Investigator Tamara Wagner ("Wagner") conducted a forensic interview with the minor child about the incident. Wagner testified she found that sexual abuse was "indicated" after interviewing the minor child, meaning that she believed something happened, but there was not sufficient information at the time of interview to substantiate sexual abuse. Wagner based her decision on the fact that the minor

child's disclosure with her was consistent with what she had disclosed to SANE Verel and law enforcement.

{¶ 31} On cross-examination, Wagner confirmed that the minor child told her that Genao ordered her to remove her clothes and she complied. The minor child then stated that Genao touched her vagina. Wagner also alleged that the minor child said Genao "fingered" her and confirmed vaginal penetration. During the interview, the minor child was sad and upset but there were also times when she was smiling and giggling. Wagner explained that she sought to build a rapport with the minor child during the beginning of the interview, when the minor child was giggling and laughing. She stopped giggling and laughing when they discussed the incident. Wagner also testified that the minor child told her about an earlier incident when Genao touched her vagina on top of her clothes.

{¶ 32} Det. Kalo conducted an interview with Genao. During the interview, Genao admitted that when he caught the minor child in her bedroom with her boyfriend, he "whipped her, maybe too much." Genao stated that a wound on his hand ripped open when he was hitting her. He told Det. Kalo that his open wound was the source of the blood found in the minor child's room. On further investigation, Det. Kalo testified on review of Genao's cell phone records, two WhatsApp calls to the Dominican Republic occurred around the time the minor child indicated Genao caught her with the boy in her bedroom.

{¶ 33} On cross-examination, the defense asked Det. Kalo about internet searches that the minor child made after the incident. He indicated that she

searched, "how long does sperm DNA stay in your body," "how long does DNA stay in a rape victim," and "how long do rape kits usually take."

{¶ 34} The State rested its case. The defense then moved for dismissal under Crim.R. 29. The trial court denied the motion as to Counts 1 through 3 but granted it on the furthermore clause to Count 4 making the offense a misdemeanor of the first degree. The furthermore clause alleged that Genao was convicted of assault against a family or household member. The parties had stipulated to the admission of the journal entry establishing the prior conviction. However, the defense pointed out that the journal entry did not include language that the victim in that case was a family or household member. The court agreed with the defense's argument that the State failed to introduce evidence that the victim of the prior conviction was a family or household member. Afterward, the defense requested that the trial court include a jury instruction on parental discipline and the State objected. The trial court held the issue in abeyance.

{¶ 35} The defense called Julie Heinig, Ph.D. ("Dr. Heinig"), a consultant who works with attorneys to provide forensic DNA services as an expert witness. Dr. Heinig did not conduct independent tests of the evidence, but did conduct a case review, which involved reviewing Analyst Svoboda's case file including reports, lab notes, and raw data. Ultimately, Dr. Heinig agreed with the results of Analyst Svoboda's report and concluded that "we don't know how or when the DNA was transferred to the sample. So, what we know is the results, we know the DNA results and comparisons were made, but we don't know how the DNA got there."

{¶ 36} On cross-examination, the State asked Dr. Heinig how often she had testified and for whom. Dr. Heinig indicated that she had testified more than 122 times for the defense, six times in civil cases, and 22 times for the State. Additionally, Dr. Heinig acknowledged that hypothetically if someone performed cunnilingus on another, one could possibly expect to find DNA. The defense rested.

{¶ 37} After denying the defense's renewed Crim.R. 29 motion, the trial court addressed the defense's request for a parental-discipline instruction. The trial court denied the request over the defense's objection.

{¶ 38} Once the case was submitted to the jury, the jury asked multiple questions. After a charge urging continued deliberation, the jury was unable to reach a verdict on the two rape counts (Counts 1 and 2) but found Genao guilty of gross sexual imposition (Count 3) and domestic violence (Count 4).

{¶ 39} The trial court subsequently conducted a second jury trial on Counts 1 and 2. The jury found Genao not guilty on Count 2 and were unable to come to a verdict on Count 1. The State dismissed Count 1 prior to sentencing.

**B. Bench Trial on Count 5**

{¶ 40} The trial court then conducted the bench trial on the charge of pandering sexually oriented matter involving a minor (Count 5). The State called Det. Kalo as its first witness. He explained how he obtained Genao's phones during the course of the initial investigation of the minor child's allegations. He obtained a search warrant for the phones and then turned them over to Richard Johnson ("Johnson"), a digital forensic examiner for the Westlake Police Department.

Johnson testified that he received multiple phones in this case and examined them pursuant to a search warrant. He was looking for "videographic" evidence of the victim, possibly in a state of undress, or involved in any kind of sexual activity. Nevertheless, the search warrant broadly covered minors in general, not just the victim. On cross-examination, Det. Kalo acknowledged that videos of the minor child were not discovered. Det. Kalo was aware that a video on Genao's phone containing child sexual-abuse material was created on October 5, 2021, and he did not know Genao's whereabouts when the video was created. However, the phone was collected from Genao in Westlake.

{¶ 41} Johnson testified he found the video attached to a chat in the WhatsApp application from an individual named "Janse." The video depicted five minors engaged in sexual activity, bestiality, and masturbation. Johnson found that the "date created" listed on the video was October 5, 2021. Johnson did not include information in his report regarding the phone's settings because he did not find the information relevant at the time. Johnson noted that a text was sent approximately nine minutes after the video. Further, Johnson testified that there were thousands of text exchanges between Genao and Janse over several years.

{¶ 42} On WhatsApp, Johnson testified that, by default, an item comes through a link that can be clicked in the chat thread. There is also an optional setting in WhatsApp to allow automatic downloads of those files. Genao's phone was set to automatically download attachments. Johnson indicated that this setting must be turned on manually. The trial court then asked Johnson whether this information

appeared in his report. Johnson indicated it was not in his report. His understanding was that he was to extract the information and write a report; it is the responsibility of others to inform him if other information should be included. During direct examination, the defense continuously objected to testimony that was not included in Johnson's report.

{¶ 43} The trial court began to discuss the issue with the State. The State argued that the video was created on Genao's phone when it was downloaded. Ultimately, the trial court found that it would be inappropriate for Johnson to continue to discuss the settings on Genao's phone because the report was silent on that issue.

{¶ 44} On cross-examination, Johnson testified that he did not find any video of the minor child on the phone. He further acknowledged that he did not do a thorough review of the phone's content, he expressly looked through video and other media for illegal content, which was a small subset of the data on the phone. Johnson denied finding any evidence that Genao asked for the video to be sent to him, nor did he find evidence that Genao shared it or forwarded it to someone else.

{¶ 45} On redirect examination, Johnson acknowledged that the text thread surrounding the video was in a mixture of English and Spanish and there was no way for him to know whether Genao requested the video. Further, Johnson testified that the phone he examined was new, and WhatsApp would have transferred the data to the new phone. Johnson further acknowledged that a user could access the

video and share it outside of WhatsApp and that he could tell if the video was shared if he had the original phone.

{¶ 46} The State then rested. The defense moved for dismissal under Crim.R. 29 arguing that there was no evidence that Genao had knowledge of the video's content that was sent to him or that he acted recklessly in receiving the video. The State argued that knowledge was established because Genao never deleted the video. Further, the State agreed that there was no evidence that Genao requested the video but there was also no evidence that he did not request the video. Finally, the State argued that if the court were to find that the State failed to present sufficient evidence to establish a violation of the indicted charge, R.C. 2907.322(A)(3), the State presented sufficient evidence to establish a violation of the "lesser included offense," R.C. 2907.322(A)(5). The trial court denied the motion. The defense then rested and renewed its Crim.R. 29 motion, which the trial court denied.

{¶ 47} The trial court found Genao not guilty on the indicted charge but found him guilty of R.C. 2907.322(A)(5), which the court found was a lesser included offense.

### C. Sentencing

{¶ 48} In October 2025, the case proceeded to sentencing on Counts 3, 4, and 5. After hearing from the minor child, and the attorneys for the State and defense, the trial court reviewed the registration duties for a Tier II sex offender or child-victim offender. The trial court then imposed a sentence of 12 months on Count 3,

gross sexual imposition; 180 days on Count 4, domestic violence; and 12 months on

Count 5, pandering sexually oriented matter involving a minor. The sentences were

to run concurrently with one another.

{¶ 49} Genao appeals, presenting the following errors for our review.

### Assignment of Error No. 1

The trial court erred in admitting, over objection, other-acts evidence at his jury trial, in violation of Rule 403 and 404 of the Ohio Rules of Evidence and [Genao's] constitutional right to a fair trial.

### Assignment of Error No. 2

The trial court erred in failing to give [Genao's] requested jury instruction on parental discipline in connection with Count [4], domestic violence, and deprived him of his constitutional right to a fair trial.

### Assignment of Error No. 3

The jury's verdict on Count [3], gross sexual imposition is against the manifest weight of the evidence.

### Assignment of Error No. 4

The trial court erred at [Genao's] bench trial in concluding that R.C. 2907.322(A)(5) is a lesser included offense of R.C. 2907.322(A)(3), the crime charged in Count [5] of the indictment, and finding him guilty of that offense, in violation of right to presentment and indictment by a grand jury secured by Article I, Section 10 of the Ohio Constitution and his state and federal constitutional right to due process of law.

### Assignment of Error No. 5

The trial court erred in overruling the defense's motion for judgment of acquittal on Count [5] because, even assuming R.C. 2907.322(A)(5) is a lesser included offense of R.C. 2907.322(A)(3), the State failed to prove all of the essential elements of that offense beyond a reasonable doubt in violation of [Genao's] constitutional rights to due process of law under the state and federal constitution.

## II. Law and Analysis

### A. Other Acts Evidence

{¶ 50} In the first assignment of error, Genao challenges the trial court's decision that allowed the State to introduce evidence of past conduct over objection. Genao claims that this "other acts" evidence was inadmissible and prejudicial under Evid.R. 404 and 403. Specifically, Genao references testimony from the minor child regarding an incident where Genao allegedly touched her vagina over her clothes in 2022, and where he allegedly wagered for a chance to see her vagina and in a thong in 2023. Genao argues that the evidence was introduced to persuade the jury that his prior conduct was evidence of his likely conduct in this case. Further, Genao argues that even if the admission was appropriate, the trial court abused its discretion because the evidence was more prejudicial than probative. The State's counterargument focuses almost entirely on whether the trial court abused its discretion. Nevertheless, Genao's argument is not well taken.

{¶ 51} Ohio courts have carved out a three-step process for determining the admissibility of other acts evidence: (1) is the evidence relevant, (2) is the evidence presented for a proper purpose pursuant to Evid.R. 404(B)(2), and (3) is the probative value of the evidence substantially outweighed by the danger of unfair prejudicial effect. *State v. Hale*, 2024-Ohio-1587, ¶ 62 (8th Dist.), citing *State v. Williams*, 2012-Ohio-5695, ¶ 19-20.

{¶ 52} Accordingly, we begin with the question of relevance. Generally, "[e]vidence which is not relevant is not admissible." Evid.R. 402. Further, relevant

evidence is that which makes "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Evid.R. 401. When considering the admissibility of Evid.R. 404(B) evidence, the question is not whether the evidence is relevant to the determination of guilt but whether the evidence is relevant to the particular purpose proffered by its proponent. *State v. Hartman*, 2020-Ohio-4440, ¶ 26. Furthermore, the trial court's ruling may not merely be that the evidence is relevant for a nonpropensity purpose; rather, "[t]he [nonpropensity] purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 27, citing *Huddleston v. United States*, 485 U.S. 681, 686 (1988). Finally, there must be some indicia that the act for which the evidence is offered occurred. *Id.* at ¶ 28. "'[S]imilar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" *Id.,* citing *Huddleston* at 689.

{¶ 53} Once it is determined that evidence is relevant pursuant to Evid.R. 401, 402, and 404(B), the court must then determine if it is admissible for a proper purpose. One of the longstanding principles in the criminal justice system is "'that proof that the accused committed a crime other than the one for which he [or she] is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit a crime.'" *Hartman* at ¶ 20 citing *State v. Curry*, 43 Ohio St.2d 66, 68 (1975). To guard against the admission of such evidence, Evid.R.404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove

the character of a person in order to show action in conformity therewith." However, the evidence can be introduced for other purposes like "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). The decision whether other acts evidence qualifies as admissible under one of the other purposes under Evid.R. 404(B) is a question of law that we review de novo. *Hartman* at ¶ 22.

{¶ 54} It is not sufficient for a party to point to one of the permitted purposes in Evid.R. 404(B) as the basis for admission and claim that the evidence is relevant. *Id.* at ¶ 23, citing *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir.2014). The relevant question is not only the "ultimate justification for admitting the evidence but also '. . . the chain of reasoning that supports the non-propensity purpose for admitting the evidence.'" *Id.*, quoting *id.* at *id.* A trial court properly applies Evid.R. 404(B) by scrutinizing "the proponent's logic to determine exactly how the evidence connects to a proper purpose without relying on any intermediate improper-character inferences." *Id.* citing *id.*

{¶ 55} Once the trial court has determined that the proponent of the evidence has established one of the permissible nonpropensity purposes for the admission of the evidence, the analysis continues. *Hartman* at ¶ 29. The trial court must still determine whether the effect of admitting the evidence would be more prejudicial than probative. *Id.* Evid.R. 403(A) (noting that exclusion of relevant evidence is mandatory when "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury"). Some factors

the trial court should consider when making this determination include the extent to which the other-acts evidence is directed to an issue that is actually in dispute; whether the prosecution is able to present alternative evidence to prove the same fact through less prejudicial means; and whether the other-acts evidence is probative of an essential element of the crime or an intermediate fact in the case. *Hartman* at ¶ 31-32.

{¶ 56} Because this analysis is highly fact specific, a reviewing court must examine the trial court's decision weighing the probative value of the evidence versus the prejudicial effect for an abuse of discretion. *Id.* at ¶ 30. A trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *State v. Jones,* 2025-Ohio-5389, ¶ 19.

{¶ 57} With this framework in mind, we examine the other acts evidence presented in this case. We begin by analyzing the relevance of the evidence to prove the purported purpose. The State argued that the evidence was relevant to establish Genao's plan to groom the minor child into acceptance of sexual advances. The State claimed that by introducing sexual acts verbally and physically into the relationship, Genao reduced the amount of force necessary to coerce the minor child into sexual activity. This would qualify as preparation and plan evidence that can be shown where

> "[t]he other acts . . . are typically either part of the 'same transaction' as the crime for which the defendant is on trial or they are part of a 'sequence of events' leading up to the commission of the crime in question." "A defendant's plan might be demonstrated through

evidence of 'prior preparatory acts,' such as the prior theft of an instrumentality used in the commission of the current crime."

(Citations omitted in original). *State v. Zolikoff*, 2025-Ohio-5040, ¶ 44 (8th Dist.), quoting *Hartman* at ¶ 41-42.

{¶ 58} Genao countered that it was not enough for the State to argue that the evidence was for any of the nonpropensity purposes. Further, the State had to establish that there was an actual issue in controversy. Genao, by a process of elimination, suggests that the State's proposed evidence could not fit into any nonpropensity purposes listed in Evid.R. 404(B). Genao claims that the evidence was not relevant to prove identity because identity was not in dispute. Furthermore, it was not relevant to establish mistake or accident because Genao did not admit to touching the minor child or allege that sexual acts occurred by mistake or accident. Finally, Genao argues that the evidence did not serve to establish grooming because "grooming" has been defined as "deliberate actions taken by a defendant to expose a child to sexual material; [where] the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." *State v. Hernandez*, 2019-Ohio-5242, ¶ 31 (8th Dist.), quoting *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011).

{¶ 59} Upon review of the evidence, we find that the State's argument for the admissibility of the evidence aligns with grooming.[1]

---

[1] After the first trial in this matter, the General Assembly enacted R.C. 2907.071 defining the offense of grooming.

{¶ 60} The fact that the State's evidence fits an appropriate nonpropensity purpose does not end our inquiry. We must also determine whether there was an issue in dispute that supports the evidence's admission. The record reflects that Genao's preparation and plan were in dispute at trial. We note that Genao's argument at trial was that the minor child fabricated the allegations; however, the defense also suggested throughout the case that the detective and others would testify that it was odd that these allegations came "out of the blue." During Wagner's cross-examination, the defense attempted to solicit her agreement that she thought it was odd that Genao would sexually assault his daughter out of the blue. The defense then pursued the same line of questioning with Det. Kalo, who initially found it odd given the circumstances that Genao would sexually assault the minor child out of the blue. He changed his opinion after reviewing all of the evidence gathered in the case. The State argued that this defense theory opened the door to the admission of the other acts evidence at issue. We agree.

{¶ 61} Based on the foregoing, we find that the trial court did not err in finding that the testimony the State sought to introduce was relevant and admissible under Evid.R. 404(B). The other acts evidence, which was comprised of the 2022 and 2023 incidents, established Genao's preparation and plan. By suggesting that the allegations were recently fabricated and that it was odd that Genao would commit these crimes "out of the blue," there was an actual dispute regarding whether he prepared and planned to commit the sexual assault. The evidence established conduct that sexualized the minor child, introduced sexuality into the

relationship between the two, lowering the minor child's inhibitions in preparation for sexual activity. The minor child testified that Genao's repeated statements that he was disappointed and had nothing to lose led her to feel "bad" and made her want to reassure Genao. The parent-child relationship certainly contributed to the grooming in this case. *See State v. Weems,* 2016-Ohio-701, ¶ 25 (8th Dist.) (noting that "in certain scenarios, especially those involving parent-child relationships, a child may feel compelled or psychologically coerced into submitting to her aggressor for reasons other than an overt show of force or threats of force"). Therefore, we find that the evidence was admissible.

{¶ 62} Nevertheless, we must still determine whether the trial court abused its discretion in finding that the probative value of the evidence was not outweighed by the risk of unfair prejudice. We find that it did not. As we have already noted, there was an actual dispute between the parties regarding whether Genao committed these crimes that made the evidence of a plan relevant. "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases." (Emphasis in original.) *Hartman*, 2020-Ohio-4440, at ¶ 31. In this case, the probative value of the evidence outweighed any prejudicial effect. It was relevant to establish that the sexual assault was not the minor child's recent fabrication, it established Genao's preparation and plan, and the trial court took steps to limit potential prejudice.

{¶ 63} The trial court both held on- and off-the-record discussions with the parties about multiple incidents of grooming behavior. However, the minor child was only able to remember two occurrences with any specificity. Consequently, the trial court limited the admission of the testimony to those two incidents, which occurred within a year or two of the allegations. Accordingly, we find the trial court did not abuse its discretion in admitting testimony regarding the 2022 and 2023 other acts.

{¶ 64} Therefore, the first assignment of error is overruled.

**B. Jury Instructions**

{¶ 65} In the second assignment of error, Genao argues that the trial court erred when it failed to give a parental-discipline jury instruction for the domestic-violence offense. We find the trial court did not abuse its discretion when it refused to give the jury instruction.

{¶ 66} "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). A trial court commits prejudicial error in a criminal case when it "'refuse[s] to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge.'" *State v. Kinnebrew*, 2018-Ohio-121, ¶ 16 (6th Dist.), quoting *State v. Sowell*, 2016-Ohio-8025, ¶ 134, quoting *State v. Scott*, 26 Ohio St.3d 92, 101 (1986). We review the trial

court's refusal to issue jury instructions for abuse of discretion. *Adams*, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989).

{¶ 67} Once a party requests a jury instruction,

[a] trial court is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction. A trial court does not err in failing to instruct the jury on an affirmative defense where the evidence is insufficient to support the instruction.

*State v. Perez*, 2020-Ohio-100, ¶ 22 (8th Dist.)*,* quoting *Cleveland v. Beasley*, 2010-Ohio-769, ¶ 33, citing *State v. Fulmer*, 117 Ohio St.3d 319, 326 (2008), and *State v. Palmer*, 80 Ohio St.3d 543, 564 (1997).

{¶ 68} In order to successfully assert a defense of parental discipline, the defendant must demonstrate that the discipline was proper and reasonable after looking at the totality of the circumstances and taking into consideration the child's age, behavior before the punishment, and prior response to noncorporal punishment, the location and severity of the punishment, and the defendant's state of mind. *State v. Cook*, 2021-Ohio-3841, ¶ 24 (1st Dist.), citing *State v. Luke*, 2011-Ohio-4330, ¶ 22 (3d Dist.), citing *State v. Hart*, 110 Ohio App.3d 250, 256 (3d Dist. 1996). Additionally, the Ohio Supreme Court has recognized that the domestic-violence statute, R.C. 2919.25(A), does not prevent a parent from properly disciplining their child. *State v. Faggs*, 2020-Ohio-523, ¶ 9. Nevertheless, a parent may not cause "physical harm" to the child as defined in former R.C. 2901.01(C), now R.C. 2901.01(A)(3). *Id.* R.C. 2901.01(A)(3) describes "physical harm to

persons" as "any injury, illness, or other physiological impairment regardless of its gravity or duration."

{¶ 69} Here, Genao argues that he was entitled to the requested jury instruction because he presented sufficient evidence of parental discipline to warrant the instruction. In the instant case, the minor child testified that Genao punched her and pushed her to the ground causing the back of her head to hit a step in her closet. Officer Smith testified that she felt a raised bump on the back of the minor child's head. Additionally, Officer Smith identified a picture of the minor child that displayed redness on her back and recalled that the minor child complained of back pain. Further, Genao admitted to Det. Kalo that he "whipped" the minor child and he may have whipped her "too much." Based on the foregoing, Genao did not present enough evidence to warrant the instruction. Therefore, we find that the trial court did not abuse its discretion when it refused to give a parental discipline instruction. Accordingly, we find that the trial court did not abuse its discretion when it refused to give a parental discipline instruction. Accordingly, the second assignment of error is overruled.

## C. Manifest Weight of the Evidence for the Gross Sexual Imposition Charge

{¶ 70} In the third assignment of error, Genao argues that the conviction for gross sexual imposition was against the manifest weight of the evidence. Genao focuses on inconsistencies in the minor child's testimony and argues that those inconsistencies warrant this court to overturn his conviction. We disagree.

{¶ 71} "'[W]eight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 2021-Ohio-856, ¶ 32 (8th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387. It addresses "'the evidence's effect of inducing belief.'" *Id.*, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386-387. The jury may notice inconsistencies in testimony, resolve them, and choose to believe all, part, or none of a witness's testimony. *State v. Hunter*, 2024-Ohio-5782, ¶ 36 (10th Dist.), citing *State v. Henderson*, 2011-Ohio-4761, ¶ 22. The reviewing court must consider all of the evidence in the record, the reasonable inferences to make from it, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Harris* at *id.*, citing *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983). "Such a determination is rare, arising only in exceptional cases in which the evidence presented at trial weighs heavily against the jury's verdict." *State v. McCollum*, 2026-Ohio-393, ¶ 14 (12th Dist.).

{¶ 72} While a manifest-weight challenge requires this court to consider the credibility of the witnesses, we are mindful that "[t]he trier of fact is best able 'to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. McCall*, 2017-Ohio-296, ¶ 14 (8th Dist.), quoting *State v. Wilson*, 2007-Ohio-

2202, ¶ 24. Further, the Ohio Supreme Court recently provided further clarification noting that

> [a]n appellate court sits as the thirteenth juror only when evidence contradicts a fact-finder's findings, see *State v. Martin*, 170 Ohio St.3d 181, 2022-Ohio-4175, ¶ 26, 209 N.E.3d 688, or when a witness's testimony is so inconsistent as to material facts, so impeached, or so fantastical as to make it patently unbelievable.

*State v. Reillo*, 2026-Ohio-2701, ¶ 3

{¶ 73} With this more limited review in mind, we address Genao's challenge to the manifest weight of his conviction for gross sexual imposition. Genao guides us to several points in the transcript that call into question the veracity of the minor child's testimony. However, the jury was free to believe some, all, or none of the minor child's testimony and clearly found that her testimony on this issue was credible. Our review of the record does not establish that the jury lost its way, that the testimony was "so inconsistent as to material facts, so impeached, or so fantastical as to make it patently unbelievable," or that this was one of the exceptional cases where the evidence weighs heavily against conviction. *Thompkins*, 78 Ohio St.3d 380, 387, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175 (1st Dist. 1983); *Reillo* at ¶ 3.

{¶ 74} Accordingly, we overrule the third assignment of error.

**D. Pandering Sexually Oriented Matter Involving a Minor**

{¶ 75} Finally, in his fourth and fifth assignments of error, Genao challenges his conviction for pandering sexually oriented matter involving a juvenile. First, he argues that the trial court erred when it found that pandering sexually oriented

matter involving a minor pursuant to R.C. 2907.322(A)(5) was a lesser included offense of R.C. 2907.322(A)(3). Second, Genao argues that if this court finds that R.C. 2907.322(A)(5) is a lesser included offense, there was insufficient evidence to support the conviction.

{¶ 76} A lesser included offense is one that

> (i) . . . carries a lesser penalty than the other; (ii) [where] the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense.

*State v. Lloyd*, 2021-Ohio-1808, ¶ 24 (8th Dist.), quoting *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph three of the syllabus; *State v. Evans*, 122 Ohio St.3d 381 (2009), paragraph two of the syllabus.

{¶ 77} However, a court may also consider an "inferior offense" of the indicted offense, which exists where the "elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements." *Id.,* citing *id.* at paragraph two of the syllabus; *State v. Beatty-Jones*, 2011-Ohio-3719, ¶ 20 (2d Dist.), quoting *Deem*, 40 Ohio St.3d at paragraph two of the syllabus (An inferior offense is one where the "elements are 'identical to or contained within the indicted offense, except for one or more additional mitigating elements.'")

{¶ 78} The elements of the indicted offense in this case, R.C. 2907.322(A)(3), require evidence that the offender, "with knowledge of the character of the material or performance involved . . . create[d], direct[ed], or produce[d] a performance that shows a minor . . . participating or engaging in sexual activity, masturbation, or

bestiality." In contrast, R.C. 2907.322(A)(5), requires evidence that the offender, "with knowledge of the character of the material or performance involved . . . knowingly solicit[ed], receive[d], purchase[d], exchange[d], possess[ed], or control[ed] any material that shows a minor . . . participating or engaging in sexual activity, masturbation, or bestiality."

{¶ 79} The first element to establish that an offense is a lesser-included offense of another is that the claimed lesser offense has a lesser penalty. A violation of R.C. 2907.322(A)(3) is a felony of the second degree, while a violation of R.C. 2907.322(A)(5) is a felony of the fourth degree, meeting the requirement that the alleged lesser included offense has a lesser penalty. Next, we determine whether there is an element of the greater offense that is not required to convict an offender of the lesser offense. An offender can create, direct, or produce a performance and not solicit, receive, purchase, exchange, possess, or control material. R.C. 2901.01(K) defines "performance" as "any motion picture, preview, trailer, play, show, skit, dance, or other exhibition performed before an audience." One can solicit, receive, purchase, exchange, possess, or control material without presenting it to an audience. Accordingly, there is an element of R.C. 2907.322(A)(3) that is not required for a conviction under R.C. 2907.322(A)(5).

{¶ 80} Finally, we address the requirement that a person convicted of R.C. 2907.322(A)(3) must always be guilty of 2907.322(A)(5). However, we find that an offender can commit R.C. 2907.322(A)(3) without always committing R.C. 2907.322(A)(5). An offender could create, direct, or produce a live

performance that meets the elements of R.C. 2907.322(A)(3) and yet not create "material" capable of being solicited, purchased, exchanged, possessed or controlled. "Material" is defined as

> any book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, description, motion picture film, phonographic record, or tape, or other tangible thing capable of arousing interest through sight, sound, or touch and includes an image or text appearing on a computer monitor, television screen, liquid crystal display, or similar display device or an image or text recorded on a computer hard disk, computer floppy disk, compact disk, magnetic tape, or similar data storage device.

R.C. 2907.01(J)

{¶ 81} Accordingly, a conviction under R.C. 2907.322(A)(3) does not always result in the offender committing a violation of R.C. 2907.322(A)(5).

{¶ 82} Still, this does not end our inquiry because an offender may be convicted of an inferior offense to the indicted offense if the trial court finds the defendant not guilty of the indicted offense, but finds that the evidence supports the conviction for an inferior offense. Crim.R. 31(C) provides:

> The defendant may be found not guilty of the offense charged but guilty of an attempt to commit it if such an attempt is an offense at law. When the indictment, information, or complaint charges an offense including degrees, or if lesser offenses are included within the offense charged, the defendant may be found not guilty of the degree charged but guilty of an inferior degree thereof, or of a lesser included offense.

{¶ 83} Accordingly, we must determine whether the "elements [of the inferior offense] are 'identical to or contained within the indicted offense, except for one or more additional mitigating elements.'" *Beatty-Jones*, 2011-Ohio-3719, ¶ 20 (2d Dist.), quoting *Deem*, 40 Ohio St.3d at paragraph two of the syllabus.

{¶ 84} A review of R.C. 2907.322 establishes that a conviction under sections (A)(1)-(4), (6), or (7) is a felony of the second degree if it involves a minor child and a felony of the third degree if it involves an impaired individual. R.C. 2907.322(A)(5), which involves the receipt or use of material created under one of the other sections is a felony of the fourth degree. R.C. 2907.322(A)(5) is an inferior offense to R.C. 2907.322(A)(3) because it mitigates the penalty where the offender was the recipient in some way of material created, advertised, or otherwise offered under one of the other versions of the offense. Accordingly, we find that the trial court correctly considered whether the evidence supported a conviction under the inferior offense.

{¶ 85} Therefore, we turn to Genao's fifth assignment of error that challenges whether his conviction under R.C. 2907.322(A)(5) was supported by sufficient evidence. Genao's argument is not well taken.

{¶ 86} Genao argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal at the end of the bench trial. Specifically, he argues that the State did not present any evidence that the video was accessed or viewed after it was sent to him. Therefore, Genao argues that the State failed to establish scienter, i.e., that Genao knew the character of the material on his phone. The State counters that it presented sufficient evidence by establishing that Genao responded to the text nine minutes after it was sent, never deleted the video, continued to converse with the sender of the video up until the police seized the phone, and "redownloaded" the video when he obtained a new phone.

{¶ 87} Crim.R. 29(A) provides:

The court on motion of a defendant . . . after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.

{¶ 88} Because "a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'" *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.), quoting *State v. Tenace*, 2006-Ohio-2417, ¶ 37.

{¶ 89} A sufficiency challenge tests whether the State met its burden of production at trial and to consider, not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *Thompkins*, 78 Ohio St.3d at 387 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, (1979). "When analyzing a claim of sufficiency of the evidence, a reviewing court is neither permitted to assess the credibility of witnesses nor otherwise weigh the evidence." *State v. Young*, 2022-Ohio-3132, ¶ 47 (8th Dist.), citing *In re A.W.*, 2016-Ohio-7297, ¶ 33 (8th Dist.). Thus, in a sufficiency — or Crim.R. 29(A) — assessment, the reviewing court assumes that witnesses testified truthfully and evaluates whether that testimony, along with any other direct or circumstantial evidence presented at trial, satisfies each element of the offense. *Cleveland v. Clark*, 2024-

Ohio-4491, ¶ 39 (8th Dist.), citing *In re D.R.S.*, 2016-Ohio-3262, ¶ 23 (8th Dist.), and *State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.).

{¶ 90} In the instant case, the State needed to establish both that Genao knew the character of the material or performance in question and that he knowingly possessed the material. A person acts knowingly when

> regardless of purpose . . . the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

{¶ 91} Therefore, "to have knowledge, a person need only believe that certain circumstances probably exist, not that they exist with 100% certainty." *State v. Duhamel*, 2015-Ohio-3145, ¶ 36 (8th Dist.). "[T]he state must 'prove that [the offender] knew the character of the material: that it involved a real minor engaging or participating in sexual activity. The state does not need to show that the defendant had precise knowledge of the contents of the material.'" *State v. Bell*, 2024-Ohio-1502, ¶ 16 (4th Dist.), quoting *State v. Kraft*, 2007-Ohio-2247, ¶ 87 (1st Dist.) (analyzing R.C. 2907.322(A)(1)).

{¶ 92} The State was required to present evidence that Genao, with knowledge of the character of the material or performance involved, did knowingly solicit, receive, purchase, exchange, possess, or control any material that shows a

minor participating or engaging in sexual activity, masturbation, or bestiality. Johnson's testimony established that a person named Janse sent the video to Genao, attaching it to a message on WhatsApp. The State's case largely focused on when the video was "created" on the phone, arguing that the date of download established creation. However, Johnson did not testify whether Genao ever accessed the video, nor did he testify regarding Genao's knowledge of the character of the material in question. The fact that Genao kept the material and that it was redownloaded onto his phone establishes that Genao knowingly possessed the material. However, it does not establish that he knew the character of the material he possessed.

{¶ 93} Nevertheless, the chat message Genao received from Janse displays a still image from the video. From that image, one can see three underage boys engaged in masturbation and leaning against an animal. Even if Genao never played the video, the image in the chat established the character of the material contained therein, i.e., underage boys engaged in sexual activity and masturbation. The State thus presented sufficient evidence to establish a violation of R.C. 2907.322(A)(5).

{¶ 94} Accordingly, we overrule the fifth assignment of error.

{¶ 95} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

conviction having been affirmed, any bail pending is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

EILEEN T. GALLAGHER, P.J., and
DEENA R. CALABRESE, J., CONCUR